# IN THE UNITED STATES DISTRICT COURT OF MARYLAND
## NORTHERN DIVISION

| | | |
|---|---|---|
| **MARANDO WARTHEN** | * | |
| 1306 Medfield Avenue | | |
| Baltimore, Maryland 21211 | * | |
| | | |
|     Plaintiff | * | |
| | | |
|     v. | * | |
| | | |
| **PATRICK M. CONLEY** | * | |
| 601 Fayette Street | | |
| Baltimore, Maryland 21202 | * | CASE#: _____ |
| | | |
|     Defendant | * | |
| | | |
| **BALTIMORE CITY POLICE DEPARTMENT** | * | |
| 601 Fayette Street | | |
| Baltimore, Maryland 21202 | * | |
| | | |
|     Defendant | * | |
| | | |
|     Serve on: | * | |
| | | |
|     Richard Worley, Commissioner | * | |
|     601 Fayette Street | | |
|     Baltimore, Maryland 21202 | * | |
| | | |
| **JOHN W. KILTY** | * | |
| Federal Bureau of Investigations | | |
| Chief of the Elemental Analysis Unit | * | |
| FBI Forensic Laboratory, | | |
| 2501 Investigation Parkway | * | |
| Quantico, Virginia 22135 | | |
| | * | |
|     Defendant | | |
| | * | |
| **ESTATE OF JOSEPH KOPERA** | | |
| Baltimore Police Department | * | |
| Laboratory Division Ballistics | | |
| 601 East Fayette Street | * | |
| Baltimore, Maryland 21202 | | |

1

Defendant                                    *

**JOHN DOE BALTIMORE POLICE OFFICERS 1–5**
individually and in their official capacities;
601 Fayette Street                           *
Baltimore, Maryland 21202
                                             *
Defendants
                                             *

**DOES 1–10**,
in their official capacities                 *
601 Fayette Street
Baltimore, Maryland 21202                    *

Defendants                                   *

                                             *
**MAYOR & CITY COUNCIL OF**
**BALTIMORE CITY**                           *
100 N. Holliday Street
Baltimore, Maryland 21202                    *

Defendant                                    *
***************************************************************************

## COMPLAINT AND DEMAND FOR JURY TRIAL

**NOW COMES**, Plaintiff Marando Warthen, by and through his attorneys, J. Wyndal

Gordon of **THE LAW OFFICE OF J. WYNDAL GORDON, P.A.**, and RAOUF M.

ABDULLAH of **RMA & ASSOCIATES, LLC.**, to submit this Complaint and Demand for Jury

Trial pursuant to F.R.Civ.P. 3 and 8, alleging as true the following:

### I. NATURE OF THE ACTION

1.      This is a civil rights action arising under 42 U.S.C. § 1983 for violations of

Plaintiff Marando Warthen's rights under the Fourth and Fourteenth Amendments to the United

States Constitution.  Plaintiff was wrongfully arrested, imprisoned, prosecuted, and convicted for

crimes he did not commit, based on fabricated, ignored, or recklessly disregarded exculpatory

2

evidence, culminating in decades of unjust incarceration.

2.      On or about January 2, 2025, an Administrative Law Judge, J. Carter-Jones, of the Maryland Office of Administrative Hearings formally determined by clear and convincing evidence that Plaintiff was erroneously convicted of a felony he did not commit, and that the scientific and testimonial evidence used against him was unreliable and contradicted by objective forensic testing.

## II.  JURISDICTION AND VENUE

Plaintiffs incorporate by reference the allegations contained in paragraphs 1 - 2 as if fully set forth herein:

3.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343, and 42 U.S.C. § 1983.   Venue is proper in this District under 28 U.S.C. § 1391(b) because the events giving rise to these claims occurred in Baltimore City, Maryland.

## III.  PARTIES

Plaintiffs incorporate by reference the allegations contained in paragraphs 1 - 3 as if fully set forth herein:

4.      Plaintiff Marando Warthen is a resident of the State of Maryland and was, at all relevant times, a private citizen entitled to the full protections of the United States Constitution.

5.      Defendant City of Baltimore is a municipal corporation responsible for the policies, practices, training, supervision, and discipline of the Baltimore Police Department.

6.      Defendant Baltimore Police Department ("BPD") is a law enforcement agency acting under color of state law.

7.      Defendant Officer Patrick M. Conley was at all relevant times a sworn officer of

the BPD, acting under color of state law.  His is being sued in his individual and/or official capacity.

8.      Defendant John W. Kilty is a former federal forensic examiner who, at all relevant times herein, acted jointly with state prosecutors and under color of state law by performing forensic analysis, preparing reports, and causing false and misleading forensic evidence to be introduced in Plaintiff's State criminal trial; Defendant Kilty is sued in his individual capacity and/or official capacity; upon information and belief, Defendant Kilty is retired and of advanced age; Plaintiff is not aware of any public confirmation of Defendant's death.

9.      Defendant Joseph Kopera was, at all times material to this Complaint, a firearms and toolmark examiner employed by the Baltimore Police Department, Laboratory Division – Ballistics Unit, who acted under color of state law in connection with the investigation and prosecution of Plaintiff Marando Warthen; Defendant Kopera is sued in his individual and/or official capacity for damages arising from his pre-trial forensic misconduct, including the fabrication and use of false and misleading expert qualifications and forensic evidence that caused Plaintiff's wrongful conviction and deprivation of liberty in violation of the Fourteenth Amendment. Defendant Kopera is deceased; pursuant to applicable survivorship law and Federal Rule of Civil Procedure 25(a), Plaintiff seeks relief against Defendant Kopera's estate and/or personal representative, whose identity will be substituted upon discovery.

10.     Defendant John Doe Officers 1–5 are BPD officers whose identities are presently unknown and who participated in the investigation, arrest, detention, prosecution, and concealment of exculpatory evidence.

11.     Defendant Does 1–10 are additional individuals or entities whose wrongful conduct contributed to Plaintiff's injuries and will be identified through discovery.

## IV.  STATEMENT OF FACTS

Plaintiffs incorporate by reference the allegations contained in paragraphs 1 - 11 as if fully set forth herein:

12.     On April 23, 1984, at approximately 3:30 a.m., a shooting occurred at the Chandelier Club, a nightclub located in the 2300 block of Reisterstown Road in Baltimore City. Two men, Michael Stewart and Joseph Johnson, were fatally shot.  At that time, Plaintiff Marando Warthen, then twenty-two years old, was approximately six feet tall and weighed about 160 pounds. He was not inside the Chandelier Club when the shooting occurred.

13.     Baltimore City Police Officer Patrick M. Conley was stationed in a marked patrol vehicle near the intersection of Reisterstown Road and Elgin Avenue.  Officer Conley reported hearing two gunshots and observing a Black male exit the Chandelier Club and run northbound. Officer Conley followed the individual briefly but lost sight of him when the individual turned onto Orem Avenue.  Upon turning onto Orem Avenue, Officer Conley encountered Mr. Warthen, who was walking alone up the street.  Officer Conley claimed that Mr. Warthen placed an object into the back of his pants.  Officer Conley stopped Mr. Warthen at gunpoint.

14.     Officer Conley did not stop, question, or detain any other individuals exiting the Chandelier Club despite the presence of multiple patrons in the area.  Officer Conley seized a revolver but failed to submit it for fingerprint testing.  Instead, he handled the weapon extensively, including opening the cylinder and placing it in his pocket, thereby contaminating or destroying any potential fingerprint evidence.  Mr. Warthen's hands were swabbed for gunshot

residue ("GSR") and submitted to the Federal Bureau of Investigation for neutron activation analysis. The FBI's Chief of the Elemental Analysis Unit conducted the testing and determined the results were inconclusive and did not establish that Mr. Warthen had fired a weapon.

15.     Despite the absence of forensic confirmation and the existence of conflicting eyewitness descriptions identifying a shooter of different height, complexion, and clothing, law enforcement proceeded with prosecution. Multiple civilian witnesses testified that Mr. Warthen was not the shooter. No witness identified Mr. Warthen as the individual who fired the weapon inside the Chandelier Club. Nevertheless, Mr. Warthen was charged, tried, and convicted in the Circuit Court for Baltimore City in November 1984. He was sentenced to a lengthy term of imprisonment.

16.     Mr. Warthen remained incarcerated for decades. In 2024, after a full evidentiary hearing, an Administrative Law Judge of the Maryland Office of Administrative Hearings found by clear and convincing evidence that Mr. Warthen was factually innocent and had been erroneously convicted of a felony he did not commit.

17.     Marando Warthen lost decades of his life for a crime he did not commit.

18.     He was twenty-two years old when police arrested him. Within hours of a chaotic nightclub shooting, officers focused on him, not because the evidence proved guilt, but because he happened to be present nearby.

19.     There were no fingerprints tying him to the gun. There was no scientific proof he fired a weapon. The FBI's own gunshot residue testing did not confirm he had fired a gun at all. Eyewitnesses described a shooter who did not match him and testified that he was not the man who pulled the trigger.

20.     Yet the investigation stopped with him.  Police did not test the gun for fingerprints.  They did not pursue other suspects.  They did not reconcile contradictory witness statements.  Instead, they moved forward as if doubt did not exist.

21.     For that failure, Marando Warthen paid with his freedom.  He spent decades incarcerated, missing family milestones, losing the chance to build a career, and living with the stigma of a murder conviction.  He aged behind bars while the world moved on without him.

22.     Years later, after the evidence was finally examined honestly, the truth emerged: he was innocent.  A judge determined that he never should have been convicted.  But innocence does not restore lost time.

23.     No verdict today can return the years taken from him, but justice requires accountability for what was done and compensation for what was lost.

### IV(a)  Wrongful Conviction, Post-Conviction Litigation, and Exoneration

Plaintiffs incorporate by reference the allegations contained in paragraphs 1 - 23 as if fully set forth herein:

24.     After Plaintiff was wrongfully convicted, he never gave up on his innocence.

25.     In 2007, it was discovered that Joseph Kopera, the State's key firearms and ballistics expert, had falsified his academic credentials for decades, including forging an academic transcript purporting to be from the University of Maryland.  This revelation fundamentally undermined the reliability of the forensic evidence presented at Mr. Warthen's trial.  Shortly after these revelations became public, Mr. Kopera committed suicide on March 1, 2007.

26.     In or about 2019, further misconduct by Mr. Kopera was uncovered, including

evidence that he had forged the initials of a purported reviewing co-worker on ballistics laboratory reports, calling into question not only his credentials but the integrity of his forensic conclusions.

27.    Armed with this newly discovered evidence, Mr. Warthen filed a successful Petition for Writ of Actual Innocence on September 12, 2022.  He argued that Mr. Kopera's testimony was vital to the State's case and that, but for that testimony, there was a substantial likelihood the jury would have acquitted him.

28.    Mr. Warthen explained that the State's theory of guilt depended on three interlocking propositions: (1)  that no one exited the club after the shooting except through the front door; (2)  that Mr. Warthen exited that door and was arrested moments later with a gun; and (3)  that the gun recovered was the murder weapon.  Mr. Kopera's ballistics testimony supplied the third and decisive link.  Without it, the remaining evidence showed, at most, that Mr. Warthen may have been a witness who exited the club after the shooting, not the shooter.

29.    Mr. Warthen further argued that excising Mr. Kopera's testimony reduced the State's case to circumstantial evidence insufficient to meet the burden of proof beyond a reasonable doubt.  No eyewitness identified Mr. Warthen as the shooter, gunshot residue testing on his hands was inconclusive, and multiple defense witnesses testified that the shooter was someone else.

30.    The Honorable Charles Peters of the Circuit Court for Baltimore City granted a hearing and, by Ruling and Order dated February 16, 2023, granted the Writ of Actual Innocence. Judge Peters concluded that the discovery of Mr. Kopera's falsified credentials constituted newly discovered evidence creating a substantial or significant possibility that the

jury would have reached a different verdict.

31.     Judge Peters found that, absent Mr. Kopera's testimony, the evidence against Mr. Warthen was entirely circumstantial and that there was no forensic evidence tying him to the crime.  The court also emphasized the substantial exculpatory evidence presented at trial, including the absence of gunshot residue and multiple eyewitness accounts identifying someone other than Mr. Warthen as the shooter.  Judge Peters further concluded that the invalidity of Mr. Kopera's testimony directly supported a finding of actual innocence, as it cast serious doubt on the reliability of the only scientific evidence used against Mr. Warthen.

32.     Following the grant of the Writ, the Baltimore City State's Attorney's Office declined to retry Mr. Warthen and entered a nolle prosequi, formally abandoning prosecution. The State did not certify that Mr. Warthen was innocent or that the convictions were entered in error.

33.     Mr. Warthen did not commit perjury, fabricate evidence, or otherwise cause or contribute to his conviction by his own conduct.

34.     Mr. Warthen was confined from November 9, 1984 until April 3, 2023, a total of 14,025 days –39 years *en toto*.

### V.  BPD's Policy and Practice of
### Conducting Flawed Investigations

Plaintiffs incorporate by reference the allegations contained in paragraphs 1 - 34 as if fully set forth herein:

35.     The constitutional violations that caused Plaintiff's wrongful convictions were not isolated events.  To the contrary, they were the result of the BPD's longstanding policies and practices of pursuing wrongful convictions through reliance on profoundly flawed investigations

and unreliable evidence.

36.     By the time of victim's deaths and the investigation that led to

Plaintiff's wrongful arrest and prosecution, those policies were firmly entrenched.  In

a race to clear murder cases, the BPD cut corners and rushed to judgment.  Sometimes those

constitutional errors were exposed prior to prosecution.

37.     For example, in 1988, four years after Plaintiff's convictions, nearly 10

percent of Baltimore's 234 homicides were cleared by the BPD through arrest but

later dropped by the State's Attorney's Office prior to indictment.

38.     Other times, however, the BPD's unconstitutional conduct was not

exposed until long after a prosecution and a conviction had been obtained.

39.     For example, on September 19, 1968, Walter Lomax was convicted of robbing a

food market and fatally shooting the market's evening manager.  It was later discovered

that several key pieces of evidence were not disclosed to Mr. Lomax's trial attorney,

including a BPD report that showed that an eyewitness identified someone else as

the gunman.  A separate police report contained notes from a witness interview in

which the witness's description of the gunman did not match Mr. Lomax.  Mr. Lomax was

granted a new trial in 2014 on the basis of these violations, and the State dismissed the charges.

40.     Similarly, Wendell Griffin was convicted of the 1981 murder of James

Wise.  In 2011, Mr. Griffin discovered numerous documents in the BPD file that

were never turned over to him, including exculpatory reports that showed that the

two key witnesses in the case had failed early in the investigation to identify

Mr. Griffin as the perpetrator.

41.    James Owens's February 1988 convictions for burglary and felony murder were overturned after Mr. Owens discovered that BPD detectives withheld evidence of several inconsistent statements by their star witness.  In 2018, Mr. Owens settled a lawsuit against the BPD and three of its detectives for $9 million.

42.    Jerome Johnson was convicted of the 1988 murder of Aaron Taylor.  In 2018, he was finally exonerated after it was learned that the key witness against him had given a dramatically different account of events on the very day the crime occurred, and a BPD officer had recorded that statement in an official report, but that report had been buried.

43.    In 1988, Anthony Coleman was tried and convicted of first-degree murder and conspiracy to commit murder. In his post-conviction proceedings, Mr. Coleman's attorney was able to elicit testimony from a BPD Homicide detective on how it was the department's practice to decide which documents to share with State prosecutors.  It was found that the detectives involved in Anthony Coleman's murder case failed to disclose exculpatory evidence to Mr. Coleman's trial counsel.  The Court of Special Appeals later remanded Mr. Coleman's case after determining that evidence had been wrongfully withheld from Mr. Coleman's trial counsel.

44.    Sabein Burgess was convicted of the 1994 murder of his girlfriend. But the BPD had highly exculpatory evidence that was never turned over, in particular, exculpatory information that the FBI had provided, and a statement from the victim's son who had seen the killers and told officers that Mr. Burgess

11

was not one of them. In 2014, Mr. Burgess's conviction was overturned.  In 2017, a

jury awarded him $15 million in his lawsuit against the BPD and one of its

detectives.  During that civil suit, BPD detectives testified to the effect that the BPD

policies and practices did not require detectives to document investigative steps,

record all evidence in official reports, or turn over all documents to prosecutors.

45.    Antoine Pettiford was convicted of murder in 1995. Mr. Pettiford's

post-conviction counsel discovered that BPD officers failed to disclose eyewitness

statements and other exculpatory evidence. Mr. Pettiford's conviction was

ultimately vacated and the charges against him were dismissed.

46.    In 1998, Rodney Addison was wrongfully convicted of a 1996 murder.

In October 2005, after nine years in prison, Mr. Addison was released when it was

revealed that the State had withheld exculpatory witness statements, and its sole

witness recanted her testimony at a post-conviction proceeding.

47.    In 1999, Malcolm Bryant was convicted of a 1998 murder and assault

that he did not commit. Mr. Bryant was exonerated in 2016. Mr. Bryant's post conviction

proceedings uncovered BPD officers' failure to disclose several key pieces of evidence

exculpating Mr. Bryant and pointing to the true suspect, including undisclosed witnesses and

witness statements.

48.    In 1999, Kenneth McPherson and Eric Simmons, two brothers, were

convicted of conspiracy to commit murder based on eyewitness testimony.  During a

post-conviction investigation conducted by the Baltimore City State's Attorney's

Conviction Integrity Unit, it was discovered that the police had failed to disclose

that one of the eyewitnesses, who was a police confidential informant, had lied about witnessing the murder.  It was also determined that the police had coerced a child witness to make a recorded statement falsely accusing Mr. McPherson and Mr. Simmons of participating in the murder.

49.     In 1999, Tyrone Jones was convicted of conspiracy to commit murder in the shooting death of a 15-year-old boy. At trial, the State presented evidence that a witness identified Jones in a photo array and that Jones had a particle of gunshot residue on his hand. During the post-conviction phase of Jones's case, his counsel discovered evidence in the BPD case file that the witness who identified Jones at trial had told a BPD officer that he had not seen the shooting or the shooter; that evidence was never disclosed to the prosecutor.  Further, internal BPD documents revealed that gunshot residue results were unreliable due to widespread contamination of police department facilities.  Despite requests by his counsel for exculpatory material, the documents were disclosed only after a court ordered their production.  Ultimately, Jones's conviction was vacated and the state nolle prossequied the charges against him.

50.     In 1999, Garreth Parks was convicted of the murder of Charles Hill.  Mr. Parks was later exonerated after it came to light that BPD officers had suppressed a police report in which a man confessed to being the shooter.

51.     In Plaintiff's case, the unconstitutional fabrication of false inculpatory evidence and/or withholding of exculpatory information and/or bad-faith destruction of exculpatory or potentially exculpatory information was undertaken pursuant to, and caused by a policy and practice on the part of the BPD.

52.     The unlawful misconduct described in this Complaint occurred systematically,

13

7 pursuant to policies and practices, and accordingly occurred in other cases as well.

53.     Indeed, in 2000 BPD finally acknowledged that the Homicide Unit was in a state of disarray. As such, in January 2000, then-Commissioner Daniel asked BPD officer Stephen Tabeling to prepare a report on the state of the Unit ("Tabeling Report").  In that report, Tabeling found that investigatory files were in a general state of disarray; that there was no procedure for ensuring that all material about an investigation had been recorded and filed appropriately; and that the Unit's practices with the assembly, storage, retrieval, confidentiality, and security of case

folders was highly deficient.

54.     Consistent with the municipal policies and practices described in the cases referenced in the preceding paragraphs as well as others, Officer Defendants in this case fabricated eyewitness statements and concealed exculpatory and impeachment evidence, including Otis's and R.D.'s initial truthful statements, and the coercive tactics that the Officer Defendants used on these witnesses to secure their fabricated statements. None of this evidence was disclosed to the State or to Plaintiff's trial counsel.

55.     Policymakers were deliberately indifferent to the violations of constitutional
        rights
described herein, and they condoned the practices described above. By condoning these practices, policymakers caused Plaintiff's injuries.

56.     The BPD failed to act to remedy the abuses described in the preceding
        paragraphs,
despite actual knowledge of the pattern of misconduct.  It thereby perpetuated the unlawful

practices and ensured that no action would be taken (independent of the judicial process) to remedy Plaintiff's ongoing injuries.

## VI.  Failure to Train, Supervise, and Discipline

Plaintiffs incorporate by reference the allegations contained in paragraphs 1 - 56 as if fully set forth herein:

57.    The constitutional violations described above were also caused by the BPD's failure to train, supervise, and discipline its police employees.

58.    The BPD's failure to train, supervise, and discipline its employees effectively condoned, ratified, and sanctioned the kind of misconduct that the Officer Defendants committed against Plaintiff in this case.  Constitutional violations such as those that occurred in this case were encouraged and facilitated as a result of the BPD's practices and *de facto* policies, as alleged above.

59.    Indeed, the Tabeling Report found numerous deficiencies in training, including in many basic legal and investigative concepts.

60.    For example, there was a failure during the relevant time period to train police employees on disclosing evidence and complying with their obligations under *Brady v. Maryland*, 373 U.S. 83 (1963), and that case's progeny and extensions, notwithstanding the obvious necessity of such training.

61.    Additionally, the BPD failed to properly supervise and discipline its police employees.  As a result, employees continued to violate citizens' rights in the manner described more fully above, with impunity.

62.    The failure to train, supervise and discipline BPD employees was consciously

approved at the highest policy-making level by policymakers who were deliberately indifferent to the violations of constitutional rights described herein, and that failure was a cause of the injuries suffered here by Plaintiff.

63.     The BPD failed to act to remedy the abuses described in the preceding paragraphs, despite actual knowledge of the pattern of misconduct.  It thereby perpetuated the unlawful practices and ensured that no action would be taken (independent of the judicial process) to remedy Plaintiff's ongoing injuries.

## VII.  Plaintiff's Damages

Plaintiffs incorporate by reference the allegations contained in paragraphs 1 - 63 as if fully set forth herein:

64.     For almost 40 years, Plaintiff was forced to live in a cage and serve a punishment for crimes he did not commit.

65.     Plaintiff was required to live in conditions that would traumatize and break down the bravest of men.  The Baltimore Sun reported that one of the facilities in which Plaintiff was held was marked by killings of inmates by other inmates.  A constant atmosphere of fear, distrust, and threats of violence from inmates permeated the prison environments.

66.     During periods of Plaintiff's wrongful incarceration, Plaintiff was forced to share a cell that was little bigger than the average parking space.  For almost 40 years, Plaintiff's life was marked by a steady stream of human rights abuses.

67.     While wrongfully incarcerated, Plaintiff was stripped of the various pleasures of basic human experience, from the simplest to the most important, which all free people enjoy as a matter of right. He missed out on the ability to share holidays, births, funerals, and other life

events with loved ones, and he was denied the fundamental freedom to live his life as an

autonomous human being.

68.    Plaintiff's 39 years of wrongful incarceration forced him into a world of isolation

in which he lost contact with many of his friends and family in the outside world.

69.    Plaintiff must now attempt to make a life for himself outside of prison without the

benefit of close to four decades of life experiences, which normally equip adults for the task.

70.    Plaintiff suffers from long-term physical ailments, including sciatica,

       degenerative

spine and bulging discs, high blood pressure, and blindness in one eye.  He further suffers from

severe post-traumatic stress disorder, anxiety, chronic nightmares, and depression.

71.    As a result of the foregoing, Plaintiff has suffered tremendous damage, including

psychological and emotional distress, all caused by the Defendants' collective misconduct.

**COUNT I**
**42 U.S.C. § 1983**
**Due Process (Against Officer Defendants)**

Plaintiffs incorporate by reference the allegations contained in paragraphs 1 - 71 as if

fully set forth herein:

72.    As described more fully above, the Officer Defendants, while acting individually,

jointly, and/or in conspiracy, as well as under color of law and within  the scope of their

employment, deprived Plaintiff of his constitutional right to due process.

73.    In the manner described more fully above, the Officer Defendants, individually,

and/or jointly, fabricated false evidence, deliberately withheld exculpatory evidence, and

destroyed exculpatory or potentially exculpatory evidence in bad faith.  In doing so, the Officer

Defendants violated Plaintiff's clearly established constitutional right to due process.

74.    Absent Defendants' misconduct, the prosecution of Plaintiff could not

and would not have been pursued, Plaintiff would not have been convicted, and Plaintiff would

have been exonerated and released sooner than he was.

75.    The Officer Defendants' misconduct directly and proximately resulted in

Plaintiff's unjust and wrongful criminal conviction and lengthy wrongful imprisonment; denied

him his constitutional right to a fair trial; and offended recognized fundamental principles of

justice and fairness, in violation of the Due Process Clause of the Fourteenth Amendment to the

United States Constitution.

76.    As a direct and proximate result of this violation of his constitutional right to a

fair trial, Plaintiff suffered injuries, including but not limited to the loss of  liberty and

psychological and emotional distress.

77.    The misconduct described in this Count was objectively unreasonable and was

undertaken intentionally, in bad faith, and with willful indifference to Plaintiff's clearly

established constitutional rights.

78.    The misconduct described in this Count by the Officer Defendants was

        undertaken

pursuant to the policy and practice of the BPD, in the manner more fully described above and in

Count V below.

**COUNT II**
**42 U.S.C. § 1983**
**Federal Malicious Prosecution (Against Officer Defendants)**

Plaintiffs incorporate by reference the allegations contained in paragraphs 1 - 78 as if

fully set forth herein:

79.    As described more fully above, the Officer Defendants, while acting individually, jointly, and/or in conspiracy or confederacy, as well as under color of law and within the scope of their employment, caused the seizure of Plaintiff by legal process.

80.    In particular, the Officer Defendants caused a criminal proceeding to be commenced and/or continued against Plaintiff that resulted in Plaintiff being deprived of his liberty, despite there being no probable cause for commencing and/or continuing that criminal proceeding, in violation of the Fourth Amendment to the United States Constitution.

81.    The proceedings against Plaintiff terminated in his favor or about February 16, 2023.

82.    As a direct and proximate result of the Officer Defendants' misconduct described in this Count, Plaintiff suffered injuries, including but not limited to loss of liberty and psychological and emotional distress.

83.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice and willful indifference to Plaintiff's clearly established constitutional rights.

84.    The misconduct of the Officer Defendants described in this Count was undertaken pursuant to the policy and practice of the BPD, in the manner more fully described above and in Count V below.

## COUNT III
## 42 U.S.C. § 1983
### Detention without Probable Cause (Against Officer Defendants)

Plaintiffs incorporate by reference the allegations contained in paragraphs 1 - 84 as if

fully set forth herein:

85.    In the manner described above, the Officer Defendants, while acting individually, jointly, and/or in conspiracy, as well as under color of law and within the scope of their employment, detained Plaintiff.

86.    There was no probable cause for Plaintiff's detention.

87.    As a result of the Defendants' action, Plaintiff's rights were violated, and he suffered injuries, including but not limited to loss of liberty and psychological and emotional distress.

88.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, in bad faith, and with willful indifference to Plaintiff's rights.

89.    The misconduct of the Officer Defendants described in this Count was undertaken pursuant to the policy and practice of the BPD, in the manner more fully described above and in Count V below.

**COUNT IV**
**42 U.S.C. § 1983**
**Failure to Intervene (Against Officer Defendants)**

Plaintiffs incorporate by reference the allegations contained in paragraphs 1 - 89 as if fully set forth herein:

90.    In the manner described above, by their conduct and under color of law, during the constitutional violations described herein, the Officer Defendants stood by without intervening to prevent the violation of Plaintiff's constitutional rights, even though they had the opportunity to do so.

91.    As a direct and proximate result of the Officer Defendants' failure to intervene to

prevent the violation of Plaintiff's constitutional rights, Plaintiff suffered injuries, including but not limited to loss of liberty and psychological and emotional distress. The Officer Defendants had a reasonable opportunity to prevent this harm but failed to do so.

92.    The misconduct described in the Count was objectively unreasonable and was undertaken intentionally, in bad faith, and with willful indifference to Plaintiff's clearly established constitutional rights.

93.    The misconduct described in this Count by the Officer Defendants was undertaken pursuant to the policy and practice of the BPD, in the manner more fully described above and in Count V below.

**Count V**
**42 U.S.C. § 1983**
***Monell* Policy Claims (Against BPD)**

Plaintiffs incorporate by reference the allegations contained in paragraphs 1 - 93 as if fully set forth herein:

94.    The actions of all the Officer Defendants and other known and unknown co-conspirators were undertaken pursuant to policies and practices of the BPD, described above, which were ratified by policymakers with final policymaking authority. These policies and practices included the failure to adequately train, supervise, and discipline officers who engaged in the alleged constitutional violations, as set forth in greater detail above.  The policies and practices also included the failure to turn over exculpatory evidence (both before and after a criminal trial) and reliance on fabricated evidence, including fabricated witness statements, identifications, and police reports.

95.    The policies and practices described in this Count were maintained and

implemented by the BPD and the City with deliberate indifference to Plaintiff's constitutional rights.

96.     As a direct and proximate result of the BPD's and the City's actions, Plaintiff's constitutional rights were violated and he suffered injuries, including but not limited to loss of liberty and psychological and emotional distress.

97.     The BPD and the City are therefore liable for the misconduct committed by the Officer Defendants.

**COUNT VI**
**42 U.S.C. § 1983**
**Due Process (Against John W. Kilty)**

Plaintiffs incorporate by reference the allegations contained in paragraphs 1 - 97 as if fully set forth herein:

98.     Defendant John W. Kilty was, at all times material, a forensic examiner who acted under color of state law by willful and knowing participation in Plaintiff's state criminal prosecution, including by conducting forensic analysis, preparing reports, and causing false and misleading forensic evidence to be introduced by the State to establish guilt.

99.     Prior to trial, Defendant Kilty conducted elemental gunshot-residue (GSR) analysis and generated conclusions and interpretive framing that exceeded the limits of the underlying science, including by overstating probative value, omitting material limitations, and converting inconclusive findings into inculpatory inferences.

100.     Defendant Kilty knew or recklessly disregarded that elemental GSR findings are non-specific, subject to environmental contamination and secondary transfer, and cannot reliably associate a person with firing a weapon, yet failed to disclose these limitations in his reports and

communications that the prosecution relied upon.

101.    Defendant Kilty's pre-trial analysis, reporting, and omissions created a false impression of scientific certainty and were material, reasonably likely to influence the jury, and causative of the State's use of false and misleading evidence at Plaintiff's trial.

102.    Defendant Kilty willfully participated in joint activity with state actors by supplying and framing forensic evidence for use in a state prosecution and by performing a public function traditionally reserved to the State, the creation and interpretation of forensic proof offered to establish guilt, thereby acting under color of state law for purposes of § 1983.

103.    As a direct and proximate result of Defendant Kilty's misconduct, Plaintiff was wrongfully convicted and deprived of liberty without due process of law, in violation of the Fourth and/or Fourteenth Amendment.

104.    Defendant Kilty's conduct was knowing, reckless, and/or deliberately indifferent to Plaintiff's constitutional rights; no reasonable forensic examiner could believe that presenting inconclusive elemental findings as inculpatory, while withholding known limitations, complied with clearly established due-process principles.

105.    Defendant Kilty is not entitled to absolute witness immunity because Plaintiff challenges pre-testimony fabrication, analysis, reporting, and omissions that caused false evidence to be introduced, not the act of testifying itself; nor is Defendant entitled to qualified immunity because the prohibition on false or misleading forensic evidence was clearly established at the time.

**COUNT VII**
**42 U.S.C. § 1983**
**Due Process (Against Joseph Kopera)**

Plaintiffs incorporate by reference the allegations contained in paragraphs 1 - 105 as if fully set forth herein:

106.    Defendant Joseph Kopera was, at all relevant times material to this Complaint, a firearms and toolmark examiner employed by the Baltimore Police Department Laboratory Division, Ballistics Unit and later by the Maryland State Police Forensic Sciences Division; in these roles, Kopera performed forensic analysis on firearms, bullets, cartridge casings, and related evidence for use in criminal prosecutions in Maryland and surrounding jurisdictions.

107.    Over the course of several decades, Defendant Kopera testified as an expert witness in hundreds of criminal cases, including state prosecutions in the Circuit Court for Baltimore City and other Maryland jurisdictions, offering opinions on firearm and ammunition comparisons, gunshot trajectory, and related ballistic conclusions.

108.    Unbeknownst to trial courts, defense counsel, and juries at the time of Plaintiff's conviction, Defendant Kopera misrepresented his academic qualifications, forensic credentials, and professional status in order to be accepted as an expert by trial judges and relied upon by prosecutors in criminal trials.

109.    In 2007, shortly after defense counsel and other members of the Maryland criminal defense bar publicly challenged Kopera's claimed qualifications and requested documentation supporting his purported degrees, it was revealed that Kopera had falsified academic credentials that he repeatedly presented as a basis for his expert testimony; in response to this revelation and the professional scrutiny that followed, Kopera committed suicide by a self-inflicted gunshot wound on March 1, 2007.

110.    Defendant Kopera's false representations about his qualifications were material to

his acceptance as an expert and to the jury's assessment of the credibility and weight of his forensic opinions; because juries place extraordinary weight on forensic experts' qualifications, Kopera's misconduct had a direct impact on the fairness of criminal trials in which he testified.

111.    Kopera's conduct, presenting himself as qualified based on fraudulent credentials, knowing that prosecutors would rely on his testimony to secure convictions, and failing to disclose the falsity of his qualifications, constituted the creation, fabrication, and use of false or misleading evidence that was material to guilt and deprived criminal defendants, including Plaintiff, of their constitutional right to a fair trial under the Due Process Clause of the Fourth, Fifth & Sixth Fourteenth Amendment.

112.    Defendant Kopera's misconduct was consistent with that identified above in Plaintiff's criminal trial and was a proximate cause of Plaintiff's wrongful conviction and resulting deprivation of liberty, as the false forensic evidence he provided was reasonably likely to affect the outcome of Plaintiff's trial.

113.    As a direct and proximate result of Defendant Kopera's misconduct, Plaintiff was wrongfully convicted and deprived of liberty without due process of law, in violation of his constitutional rights, including his rights under the Fourth, Fifth, Sixth, and/or Fourteenth Amendments.

## COUNT VIII
## Indemnification
## (Baltimore City)

Plaintiffs incorporate by reference the allegations contained in paragraphs 1 - 113 as if fully set forth herein:

114.    Maryland law provides that public entities are directed to pay any tort judgment

for compensatory damages for which employees are liable within the scope of their employment activities.

115.    The Officer Defendants are or were employees of the Baltimore Police Department, who acted within the scope of their employment in committing the misconduct described herein.

**WHEREFORE**, Plaintiff, Marando Warthen, respectfully requests that this Court enter judgment in his favor and against Defendants Baltimore City Police Department, Patrick M. Conley, John W. Kilty, Joseph Kopera, John Does (Unknown Officer Defendants) and Does (Employees of the Baltimore Police Department), and the Mayor and City Council of Baltimore, awarding compensatory damages in an amounts that exceeds $75,000, attorneys' fees pursuant to §1988, and costs against each Defendant, and punitive damages against each Defendant ***except*** for the City of Baltimore (Municipality) and the Baltimore Police Department; Plaintiff Warthen further requests such other and further relief deemed fair and just.

Respectfully submitted,

/s/ J. Wyndal Gordon
J. Wyndal Gordon
Attorney ID#:  9506210156
Fed. ID#: 23572
**THE LAW OFFICE OF J. WYNDAL
GORDON, P.A.**
20 South Charles Street,
Suite 400
Baltimore, Maryland 21201
410.332.4121 o
410.347.3144 f
jwgaattys@aol.com
Attorney for Plaintiff, Marando Warthen


/s/ Raouf M. Abdullah
Raouf M. Abdullah
Attorney ID#: 475700
**RMA & ASSOCIATES, LLC.**
14714 Main St Ste 1,
Upper Marlboro, Maryland 20772
(301) 979-7427
rma@rmalawfirm.com
Attorney for Plaintiff, Marando Warthen

## IN THE UNITED STATES DISTRICT COURT OF MARYLAND
## NORTHERN DIVISION

**MARANDO WARTHEN**                                  *
1306 Medfield Avenue
Baltimore, Maryland 21211                            *

      Plaintiff                              *

      v.                                     *

**PATRICK M. CONLEY**                                *
601 Fayette Street
Baltimore, Maryland 21202                            *    CASE#: _____

      Defendant                              *

**BALTIMORE CITY POLICE DEPARTMENT**   *
601 Fayette Street
Baltimore, Maryland 21202                            *

      Defendant                              *

      Serve on:                              *

      Richard Worley, Commissioner           *
      601 Fayette Street
      Baltimore, Maryland 21202              *

**JOHN W. KILTY**                                    *
Federal Bureau of Investigations
Chief of the Elemental Analysis Unit                 *
FBI Forensic Laboratory,
2501 Investigation Parkway                           *
Quantico, Virginia 22135
                                             *
      Defendant
                                             *

**ESTATE OF JOSEPH KOPERA**
Baltimore Police Department                          *
Laboratory Division Ballistics
601 East Fayette Street                              *
Baltimore, Maryland 21202

28

Defendant                                    *

**JOHN DOE BALTIMORE POLICE OFFICERS 1–5**
individually and in their official capacities;
601 Fayette Street                           *
Baltimore, Maryland 21202
                                             *

Defendants                                   *

**DOES 1–10**,
in their official capacities                 *
601 Fayette Street
Baltimore, Maryland 21202                    *

Defendants                                   *

                                             *

**MAYOR & CITY COUNCIL OF
BALTIMORE CITY**                             *
100 N. Holliday Street
Baltimore, Maryland 21202                    *

Defendant                                    *
**************************************************************************

## JURY DEMAND

Plaintiff, Marando Warthen, hereby demands a trial by jury pursuant to F. R. Civ. P. 38

on all issues so triable.

Respectfully submitted,

/s/ J. Wyndal Gordon
J. Wyndal Gordon
Attorney ID#: 9506210156
Fed. ID#: 23572
**THE LAW OFFICE OF J. WYNDAL
GORDON, P.A.**
20 South Charles Street,
Suite 400
Baltimore, Maryland 21201
410.332.4121 o
410.347.3144 f
jwgaattys@aol.com
Attorney for Plaintiff, Marando Warthen


/s/ Raouf M. Abdullah
Raouf M. Abdullah
Fed. ID#:
**RMA & ASSOCIATES, LLC.**
14714 Main St Ste 1,
Upper Marlboro, MD 20772
(301) 979-7427 o
rma@rmalawfirm.com
Attorney for Plaintiff, Marando Warthen

30